

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

**FILED**

U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

MAY 1 3 2008

DAVID J. MALAND, CLERK

BY

DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| | § |
| -vs.- | § |
| | § |
| MICHAEL GUY CARY, SR. | § |

Criminal No. 4:08cr 93

Judge  Schell

## INFORMATION

The United States Attorney's Office charges that:

## COUNT ONE

<u>Violation:</u> 18 U.S.C. § 1349
(Conspiracy to Commit Wire Fraud in
violation of Title 18, United States Code,
Section 1343)

**Introduction**

At all times material to this Information:

1.      Defendant **MICHEL GUY CARY, SR. ("CARY")** owned, operated, and controlled

Harris Pauley Corporation, a business located at 1315 N. Federal Highway in Hollywood, Florida

that was involved in real estate investments.

2.      "Co-Conspirator Escrow Officer," an individual known to the United States Attorney,

owned, operated, and controlled RE Services, a business located at 101 W. Renner Road in

Richardson, Texas that acted as a point of contact between real estate brokers, real estate agents,

buyers and sellers of real estate, and title attorneys.

3.      "Co-Conspirator Appraisers," individuals known to the United States Attorney, were real estate appraisers licensed by the state of Texas and responsible for independently appraising the value of houses that were in the sales process and submitting the independent appraisal to lending institutions so that the lending institutions could determine whether or not to fund mortgage loans.

4.      "Co-Conspirator Investors," individuals known to the United States Attorney, were individuals solicited by **CARY** through multiple national publications to invest in real estate by using their credit to qualify for and obtain mortgage loans in exchange for payments of between $2,500 and $5,000.

5.      Argent Mortgage Company ("Argent") was a lending institution located at 2550 Golf in Rolling Meadows, Illinois, that accepted applications for and funded mortgage loans.

**The Conspiracy and its Objects**

6.      Between on or about August 10, 2004 and on or about May 20, 2006 in the Eastern District of Texas, **CARY**, the Co-Conspirator Escrow Officer, the Co-Conspirator Appraisers, the Co-Conspirator Investors, and other individuals both known and unknown to the United States Attorney, conspired, confederated, and agreed to devise a scheme and artifice to defraud Argent and to obtain money from Argent by means of false and fraudulent pretenses, representations, and promises, and in execution of the scheme and artifice, to cause writings, signs, and signals to be transmitted by means of wire communication in interstate commerce, a violation of Title 18, United States Code, Section 1343.

**Manner and Means of the Conspiracy**

It was part of the manner and means of the conspiracy that:

7.    **CARY** arranged for the following two types of simultaneous transactions to take place involving the sale and purchase of houses in the Eastern District of Texas and elsewhere:

      A.    First Transaction:

          (1)    **CARY** identified or caused to be identified newly-constructed houses and their builders in the Eastern District of Texas and elsewhere and purchased or arranged to purchase these houses directly from the builders (e.g., Pulte Homes of Texas, Ltd.).

          (2)    **CARY** purchased or arranged to purchase these homes in the name of shell companies (e.g., "PHT Asset Management").

          (3)    **CARY** transferred or arranged to transfer the title of the houses from the shell companies into d/b/a names deceptively similar to the builders for the newly-constructed houses (e.g., "Pulte Homes, Inc.").

          (4)    **CARY** set up or caused to be set up bank accounts in d/b/a names deceptively similar to the builders for the newly-constructed houses that **CARY** identified (e.g., "Harris Pauley Corporation d/b/a Pulte Homes, Inc.") (collectively "Deceptive Bank Accounts"); these names were in all instances similar to the legitimate builders' names and served to conceal from all parties to the transactions the true seller of the houses.

(5)     **CARY** directed the Co-Conspirator Appraisers to appraise the houses with fraudulently inflated values for resale purposes.

(6)     **CARY** contacted the Co-Conspirator Appraisers by means of wire communications and directed the Co-Conspirator Appraisers to reach target prices for the houses by inflating the value of the houses by amounts ranging in value from in excess of $30,000 to almost $300,000.

(7)     **CARY** provided the Co-Conspirator Appraisers with supporting documents by means of wire communication in order to falsely justify the inflated appraisal amounts.

(8)     The Co-Conspirator Appraisers completed the appraisals and falsely inflated the values of the houses as directed by **CARY**.

(9)     The Co-Conspirator Appraisers signed and certified the false appraisals as being true and correct.

(10)    **CARY** and the Co-Conspirator Appraisers caused the false appraisals to be submitted to Argent and other lending institutions by means of wire communication in order to induce Argent and other lending institutions to extend mortgage loans.

(11)    Argent and the other lending institutions relied in significant part on the false appraisals conducted by the Co-Conspirator Appraisers to extend mortgage loans to the Co-Conspirator Investors; Argent and

the other lending institutions extended these loans by means of a wire transaction.

(12)   **CARY** represented or caused to be represented to Argent and the lending institutions that these were new houses being sold directly by builders as opposed to being held and sold by **CARY**-controlled business entities.

B.   Second Transaction:

(1)   Using mail and wire communications, **CARY** falsely represented to the Co-Conspirator Investors that their credit information was needed only to make the initial purchase of the houses, and that once purchased, the titles to the houses and the applicable mortgage loans would be transferred from the Co-Conspirator Investors to **CARY**'s name or into the name of Harris Pauley Corporation.

(2)   Using mail and wire communications, **CARY** falsely represented to the Co-Conspirator Investors that they would be purchasing newly-constructed houses directly from the builders; **CARY** instead intended to sell the Co-Conspirator Investors the houses that **CARY** had previously purchased and transferred into the d/b/a names deceptively similar to the builders for the newly-constructed houses.

(3)   **CARY** completed or caused to be completed Uniform Residential Loan Applications using the personal information of the Co-

Conspirator Investors as well as falsified income and/or asset information; the Uniform Residential Loan Applications were directed at the purchase of the houses that **CARY** had previously purchased and transferred into the d/b/a names deceptively similar to the builders for the newly-constructed houses.

(4)    **CARY** directed the Co-Conspirator Investors to sign and certify the Uniform Residential Loan Applications; **CARY** and the Co-Conspirator Investors then caused the Uniform Residential Loan Applications to be submitted to Argent and other lending institutions in order to cause Argent and other lending institutions to extend mortgage loans to the Co-Conspirator Investors for the purchase of the homes.

(5)    Argent and the other lending institutions relied in significant part on the false income and/or asset information in the Uniform Residential Loan Applications to extend mortgage loans to the Co-Conspirator Investors; Argent and the other lending institutions extended these loans by means of a wire transaction.

8.    The Co-Conspirator Escrow Officer arranged for the transactions identified in paragraph 7 to occur simultaneously in order to ensure that Argent and the lending institutions could not determine that **CARY** – not the builders – was the actual seller of the houses to the Co-Conspirator Investors.

9.      Using mail and wire communications, the transactions were completed simultaneously at the behest of **CARY** and under the direction of the Co-Conspirator Escrow Officer as follows:

A.      The newly-constructed houses were purchased from the builder (e.g., Pulte Homes of Texas, Ltd.) in the name of the shell companies (e.g., "PHT Asset Management") in cash transactions.

B.      The houses were sold to the Co-Conspirator Investors by the shell companies (e.g., "Pulte Homes, Inc."). The Co-Conspirator Escrow Officer facilitated the transactions by transferring the money from the Co-Conspirator Investors (which was obtained as a loan from Argent and the lending institutions based on the false appraisals and the false statements regarding income and assets) to **CARY**'s Deceptive Bank Accounts (e.g., account in the name of "Harris Pauley Corporation d/b/a Pulte Homes, Inc.").

C.      The title to the home, as well as the mortgage loan, were placed in the name of the Co-Conspirator Investors.

D.      **CARY** received the bulk of the price differences between the amounts that **CARY** paid to purchase the houses from the builders and the amounts corresponding to the inflated appraisals based on which **CARY** sold the houses to the Co-Conspirator Investors.

10.     **CARY** never transferred the title and mortgage into his name or the name of Harris Pauley Corporation, and the Co-Conspirator Investors were unaware that the titles to the houses and the mortgages remained in their names.

11.    **CARY** paid the Co-Conspirator Investors for their role in obtaining the mortgage loans.

12.    **CARY** paid the Co-Conspirator Appraisers for their role in performing the false appraisals.

13.    **CARY** leased the homes to other individuals and collected rental payments from these individuals.

14.    Argent did not receive payments on the mortgage loans from **CARY** or from the Co-Conspirator Investors and thereby suffered losses.

15.    Despite having the houses as collateral for the mortgage loans, Argent did not recoup the value of the mortgage loans it had extended because the appraisals had been inflated; Argent thereby suffered losses.

**Overt Acts**

In furtherance of the conspiracy and to effect its objects and purposes, **CARY**, the Co-Conspirator Escrow Officer, the Co-Conspirator Appraisers, the Co-Conspirator Investors, and other individuals both known and unknown committed, among others, the following acts:

16.    For a house at 1118 Silverhorn in Frisco, Texas, in the Eastern District of Texas:

A.    On or about September 29, 2004, **CARY** directed a Co-Conspirator Appraiser to conduct a false appraisal.

B.    On or about September 29, 2004, a Co-Conspirator Appraiser completed and signed a false appraisal reflecting a fraudulent inflation of $70,000.

C.    On or about October 6, 2004, a Co-Conspirator Appraiser caused the false appraisal to be sent by wire communication, to wit, electronic mail, from McKinney, Texas in the Eastern District of Texas to Argent in Rolling Meadows, Illinois.

D.    On or about October 24, 2004, based in part on the false appraisal submitted by a Co-Conspirator Appraiser and instructions that **CARY** caused to be provided to Argent, Argent disbursed approximately $315,000 by means of wire transaction to the Co-Conspirator Escrow Officer for payment to **CARY**.

17.    For a house at 2230 Jaguar in Frisco, Texas, in the Eastern District of Texas:

A.    On or before May 23, 2005, **CARY** directed a Co-Conspirator Appraiser to conduct a false appraisal.

B.    On or before May 23, 2005, a Co-Conspirator Appraiser completed and signed a false appraisal reflecting a fraudulent inflation of $95,722.

C.    On or before May 23, 2005, a Co-Conspirator Appraiser caused the false appraisal to be sent by wire communication, to wit, electronic mail, from McKinney, Texas in the Eastern District of Texas to Argent in Rolling Meadows, Illinois.

D.    On or about June 16, 2005, based in part on the false appraisal submitted by a Co-Conspirator Appraiser and instructions that **CARY** caused to be provided to Argent, Argent disbursed approximately $300,000 by means of wire transaction to the Co-Conspirator Escrow Officer for payment to **CARY**.

All in violation of 18 U.S.C. § 1349.

## COUNT TWO

Violation: 18 U.S.C. § 1956(a)(1)(B)(i)
(Laundering of Monetary Instruments)

Between on or about March 29, 2004 and April 1, 2004, in the Eastern District of Texas and regarding a property located at 7105 Grand Hollow, **CARY** did knowingly and willfully conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, to wit, transfers of funds in the amount of $553,775.29 through three bank accounts under the names of "American Title" at Bank of Texas, "Harris Pauley Corporation d/b/a Weekley Homes, Inc." at Bank of America, and "Harris Pauley" at Bank of America, which involved the proceeds of a specified unlawful activity, that is Wire Fraud in violation of 18 U.S.C. § 1343, knowing that the transaction was designed in whole and in part to conceal and disguise, the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction, that is funds and monetary instruments in the amount of $553,775.29 represented the proceeds of some form of unlawful activity.

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

### Pursuant to 18 U.S.C. §§ 982(a)(1) and 982 (a)(4)

As the result of committing violations of 18 U.S.C. § 1956(a)(1)(B)(i) as stated in this Information, **CARY** shall forfeit to the United States all property, real or personal, that constitutes or is derived from proceeds traceable to the aforementioned violations, including but not limited to the following:

### Cash Proceeds

Approximately $6,172,901.25 in United States currency and all interest and proceeds traceable thereto, in that such sum in aggregate is property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the foregoing offenses alleged in this Information.

### Substitute Assets

If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant -

(a)     cannot be located upon the exercise of due diligence;
(b)     has been transferred or sold to, or deposited with a third person;
(c)     has been placed beyond the jurisdiction of the court;
(d)     has been substantially diminished in value; or
(e)     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. § 982(a)(4), to seek forfeiture of any other property of Defendant up to the value of the above forfeitable property, including but not limited to all property, both real and personal owned by Defendant.

By virtue of the commission of the offenses alleged in this Information, any and all interest **CARY** has in the above-described property is vested in the United States and hereby forfeited to the United States.

Respectfully submitted,

JOHN L. RATCLIFFE
United States Attorney


_____
Shamoil T. Shipchandler
Assistant United States Attorney
101 East Park Boulevard, Suite 500
Plano, Texas 75074
tel: (972) 509-1201
fax: (972) 509-1209

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| -vs.- | § | Criminal No. 4:08cr |
| | § | Judge |
| MICHAEL GUY CARY, SR. | § | |

### NOTICE OF PENALTY

### COUNT 1

Violation:        Title 18, United States Code, Section 1349

Penalty:        Not more than twenty years imprisonment, a fine not to exceed $250,000, or not more than the greater of twice the gross gain to the defendant or twice the gross loss to one other than the defendant, or both; supervised release of not more than three years.

Special
Assessment:        $100.00

### COUNT 2

Violation:        Title 18, United States Code, Section 1956(a)(1)(B)(i)

Penalty:        Not more than twenty years imprisonment, a fine not to exceed $500,000, or not more than the greater of twice the gross gain to the defendant or twice the gross loss to one other than the defendant, or both; supervised release of not more than three years.

Special
Assessment:        $100.00